Case number 21-3498, Jones Brothers Incorporated v. Mine Safety and Health Administration et al. All arguments not to exceed 15 minutes per side. Mr. Douglas R. Pierce for the petitioner. May it please the court. I'm Doug Pierce and I represent Jones Brothers Inc. I'd like to reserve four minutes for rebuttal. This is a case about jurisdiction. Specifically, if Jones Brothers was operating a borrow pit, which is what we contend, then it was subject to jurisdiction and the regulations of OSHA and not the jurisdiction and regulations of MSHA. To determine whether we had a borrow pit or a mine, it's necessary to make reference to the interagency agreement that exists between OSHA and MSHA. Because this is a jurisdiction case, the burden of establishing jurisdiction is always upon the secretary in this case. I will acknowledge that all facts that were necessary must be shown, must be proved by MSHA in this case, but at this stage, those facts would be established if there is substantial evidence. But if the substantial evidence doesn't exist for any fact that's necessary for jurisdiction, then there is no jurisdiction and the case should be dismissed. Under the interagency agreement, which as I say is controlling in this case, there are five criteria that determine if something is a borrow pit as opposed to a mine. Now the ALJ in this case found that three of those criteria basically went against us and therefore this was not a borrow pit, it was a mine according to the ALJ. The first of those is a requirement that the pit be operated on a one-time or intermittent basis. Now that's all that the agency agreement says about it. It doesn't give you any kind of definition of what the time should be. One second, one hour, one week, whatever. It is the position of Jones Brothers that one time means one occasion, which is this one project for which this project existed. This pit existed for one purpose and one purpose only and that was to provide fill material for this one limited road repair in DeKalb County, Tennessee. It was not used for any other purpose. If the timing, I'm struggling with your redefining the definition here because at issue here is whether it was a one-time or intermittent and the examples that are in the ALJ's decision relate to places that are used for a very short period of time and then time goes on and they're used again for a very short period of time. But didn't this pit's extraction occur up to six days a week over the course of several months? No, Your Honor. I want to address that. Now the first thing, and there is some discussion about the volume of material removed. Number one, we don't have any proof as to volume. Well, you know what volume was being purchased. Yeah. That is correct. The state of Tennessee. But that doesn't mean that's how much was extracted. That's how much the state was going to pay if we extracted, that's how much they paid. But that doesn't mean that's how much... That was your expectation of the quantity of... That was an expectation, that was an estimate. But that is volume and I just wanted to get that out of the way and of course the interagency agreement doesn't speak in terms of volume, it speaks in terms of time and you said I was trying to redefine it. I don't think I'm redefining it. It's one time or intermittent basis. I agree with that completely. The question is, but it doesn't say time. How much time? One time, in our opinion, is this one job. So under your argument, if it's a job that lasted two years, it could still be a borrow pit of a one time or intermittent use if you worked in that area for that two year time frame. I would say that if MSHA and OSHA wanted to have something other than what I'm saying right now, they need to be a little bit more specific, but I am saying... What is the case that you have that would suggest that one time means this whole job? What case law do you have that says one time means this whole job? I don't think there's any case law. There's a number of cases that go both ways, and we've cited it to the court, and I fully acknowledge that some of these decisions by the commission about the ALJs, they'll say this, but others, they won't, and there's just... Doesn't that get us back into the standard of review here? Because the standard of substantial evidence is that the relevant inquiry is whether there is such relevant evidence as a reasonable mind might accept as adequate to support the conclusion, and it doesn't matter if you or I would reach a different conclusion. And so if that is the case law, the quantity of case law that you're looking at, why isn't what this ALJ decided relevant evidence that a reasonable mind might accept as adequate to support the conclusion? It does not overcome the decision here. Well, I want to come back to one of your questions that I specifically disagreed with you, and that is wasn't this thing operated six days a week for all this period of time? Answer that for me. Yes. But before you do that, why don't we talk about the standard of review? Because that's what governs this case. Your job is to show that this is not substantial evidence. Substantial evidence did not support this decision, so that this ALJ did not find such relevant evidence as a reasonable mind might accept as adequate to support her conclusion. Well, Your Honor, on standard of review, I'm not disagreeing with you on that point, but there is a certain degree of vagueness, and so I'm not disagreeing with you on that point, but I did want to answer that one question that you said you wanted me to answer. The point is, is what – Mr. Pearson, unless Judge Strantz has more questions about this factor number one, there are five different factors. Yes. And I just hope we allow a little bit of time for a couple other factors that are important here. Sure. I think we're in agreement on the standard of review. I think we are too. I just want to confirm, to finish up that one point that I disagreed with Your Honor. The clock is running. We've got other factors. Yes, yes. The point is, is the Secretary has conflated the waste pit with the borrow pit, and there is zero proof on how long this pit operated as a borrow pit. Zero proof, and that was their burden, and they didn't do it. To address the issue of whether mining was taking place here, when mining can include the idea of sizing, and the ALJ found there was sizing here because of pattern blasting and the sized bucket. Could you address yourself to that and why there isn't substantial evidence to support that finding, if that's your position? Yes, Your Honor. Now, you said mining. I think milling is what the correct term – milling is one of the 18 different processes – is defined as where milling is occurring, and milling can occur using pattern blasting and sized buckets. Well, that's what the ALJ said. Number one, there are 18 things that constitute milling. Blasting is not one of them. The ALJ said, oh, these are examples. When you look at that interagency agreement, those are not examples. Those are the only 18 things that exist, and none of them come anywhere close to being blasting. So that takes care of blasting. The other one was a slotted bucket, which is a very crude device. This is one of the three ways that she went on. But we are specifically allowed to use a scalping screener, and we provided proof, and I hope the Court will have a chance to look at it. It's a very short video of what a scalping screener is. It is a very sophisticated device that does a lot that the slotted bucket doesn't do. So if we could have a scalping screener, which we were clearly entitled to have, we were surely allowed to have a slotted bucket. And the other one was the suggestion that we were using a whole ram to break up this rock. All of the witnesses said we did not use a whole ram to break up the rock for the purposes of taking it down to the road. All of them said that, and then the Court went off on this theory that, well, you must have been doing it. That is not substantial evidence. Specifically what the judge was saying is she acknowledged that all of our witnesses said we weren't doing it, but she said that Kevin Henson said, well, we could have done it, and Kevin Henson said it wouldn't be economical to do it, and she said, well, it would be economical not to do it. But she made an assumption that if we were breaking the rock, we were breaking the rock small enough to load up on the trucks. And that's not what we were doing. That's contrary to the evidence. Can I take you back to my question while you take a breath here? Yes. Milling includes sizing. I agree in that 18 list or whatever it is, there's no mention of blasting. But the ALJ found that pattern blasting can constitute sizing when combined with this bucket. So could you address yourself to that, please? Well, I think you've got to take them one at a time. The pattern blasting, I mean, all blasting, if it's done, and we were doing blasting under OSHA regs, so I don't want anybody to think that we're not under regulation. I mean, they don't willy-nilly just start putting explosives anywhere. They were clearly trying to get size of a rock as best they could. But as Ben Coleman, the blaster, said, it's an art, not a science. Sometimes these rocks would come off as big as a pickup truck. And that's where the whole ram would have to come in because a bulldozer cannot move a rock as big as a bulldozer. Why is the ALJ wrong to say that under the circumstances here, this pattern blasting plus the bucket doesn't constitute sizing? Because the blasting in itself constituted no sizing whatsoever. It did not separate the materials. And the slotted bucket does so very little, certainly when compared to a scalping screener that we were entitled to use. The blasting is merely the excavation. Their own investigator, Danny Williams, agreed that that's what the blasting was, was the excavation. And excavation, I mean, that happens both mines and burl pits. That does not establish milling. All right. You have your four minutes rebuttal. Thank you. Morning. Morning. May it please the court. Jennifer Ledig on behalf of the secretary, the appellee. Jones Brothers Limestone Quarry was a mine. It was a mine under the Mine Act. It was a mine under the interagency agreement. And it's a mine because it failed to qualify for any of the Jones Brothers was operating a mine as defined by Section 3H1A of the Mine Act. It was an area of land from which minerals are extracted in non-liquid form. Jones Brothers has never disputed that its core of quarry satisfied the Mine Act's definition of a mine. Moreover, this is a mine under the most straightforward conception of a mine, as evidenced by the photos of the quarry taken by the Emsha inspector. Jones Brothers was extracting and processing over 68,000 tons of limestone. These activities trigger the types of safety concerns the Mine Act was intended to remedy. It would defy Congress's intent to allow Jones Brothers to evade Mine Act jurisdiction. Further, the ALJ's determination that the quarry was under Emsha jurisdiction is consistent with the legislative history of the Mine Act, which explained what is considered to be a mine under this act is to be given the broadest possible interpretation. There were other orders in this case that were complied with and not challenged here. Is that correct? Yes. And weren't some of those orders the recognition that being a mine you have to have appropriate types of training for safety? Absolutely. Those were not challenged, right? Exactly, Judge Strange. This underscores the importance of the Mine Act and brings us to the point one of this being a long-term operation Jones Brothers was exposing these miners, these untrained miners, to safety hazards for up to eight months. The judge properly determined that Jones Brothers struck out on three of the four borrow pit elements. If this court concludes substantial evidence supported even one of Judge Ray's findings, the site cannot qualify as a borrow pit. And as was pointed out earlier, Jones Brothers has a heavy burden to overcome because Jones Brothers is trying to disturb the judge's credibility determinations and well-supported findings of fact. So turning to the first element, Jones Brothers was extracting limestone for up to ten hours a day, six days a week, for up to eight months, not on a one-time only basis. Jones Brothers is asking this court to reweigh the evidence. But what do you mean by a one-time only basis? You can only go on a piece of property for one hour in one day? Well, it's not defined by the interagency agreement, which is why looking to commission case law is helpful. Jones Brothers can't point to a single case where their model of operations would have qualified as intermittent or one-time only. Drillix is instructive on this. If you have a project where you need to obtain the material that you're getting out of a borrow pit, you would concede that, more likely than not, you're not going to accomplish that in one day, right? Certainly. How about one month? If you use it for a month, does that disqualify it for being a borrow pit? Well, in this hypothetical, it might depend on how much volume is extracted, how large the pit is. Jurisdiction is a very nuanced, fact-specific inquiry. But I don't see any nuancing in that aspect of the ALJ decision at all, except to say that they were taking a lot of material out for a long period of time. And if you can't tell me how long is too long, then how do you uphold the ALJ decision on that factor? Well, on this factor, we know that this mine was operating for up to eight months. And so we don't even have to look at these borderline line questions of, is it a week, is it a second? Because here, Jones Brothers was operating for eight months. So eight months is, by definition, in your world, too long to be a borrow pit? Well, there's no de minimis threshold for mining. So this was a mine under the Mine Act. And even looking to, and the inquiry could end there, this is a mine under Congress's definition of a mine. But even if we look to the interagency agreement, it's a mine because Jones Brothers was mining. The interagency agreement specifies exclusive MSHA authority arising from mining operations, including quarrying and open pit mining of limestone. Again, we could end there. We don't even have to get to milling. You absolutely can't end there. They concede that on the face of the Mine Act, this is a mine. The interagency agreement, however, carves out borrow pits, and they claim they're a borrow pit. So you can't stop at the definition of mine. You've got to go on to figure out whether this fits within the interagency exception for borrow pits. Well, if it's a mine, it can't be a borrow pit. Well, you probably should redo your interagency agreement then because you've got a whole bunch of paragraphs that aren't necessary. The interagency agreement says a borrow pit is not a mine and a mine is not a borrow pit. So I was just going through the way the commission case law analyzes this is, is it a mine under the Mine Act? Is it a mine under the interagency agreement? And in Alaska Department of Transportation, the commission held that the interagency agreement provides an independent basis for MSHA jurisdiction over Jones Brothers' operation before the question of milling or borrow pits is even reached. So, again, this is the interagency agreement. It's just allocating from the secretary's perspective what activities should be regulated by MSHA or by OSHA. And here the interagency agreement provides two independent bases for MSHA jurisdiction. We don't even have to get to the borrow pit. But looking to the borrow pit elements, Jones Brothers fails again on three of the four. The ALJ did not express a determination on the first of the five factors. Extracted material has to be overburdened. Do you know why there was no expression or finding by the ALJ on factor number one? Judge Ray's decision didn't explicitly in the discussion didn't explicitly find that Jones Brothers removed overburden. But on the decision page three, that's appendix 532, and the decision page 11, Judge Ray found that Jones Brothers first cleared the overburden. And Jones Brothers or another contractor had removed the timber, dirt, and rock above the graded salt rock. And all of that is supported by testimony of Foreman Anthony Williams, Jones Brothers President, and Inspector Williams' testimony. So I believe that the decision does support the Secretary's position that this was not overburden. It was bedrock. It was consolidated limestone. Is there any challenge to the finding that the method of use of this area constituted the same standard as in quarries where there is blasting down, drive roads are established that wind down through the actual hard rock as opposed to the requirement of a borrow pit that what is extracted is simply overburdened? I didn't see a challenge to that because I thought the site itself, the pictorial site itself satisfied those requirements. Is that correct? That it was a quarry? That it functioned like a quarry in that it was not overburden being removed. It was hard rock that was blasted down and accessed by roads. Absolutely. Inspector Williams testified that this was an open pit mine and he described in detail what open pit mining was. That's on appendix 101 to 102. He described how this was an excavation of the normal ground. It's been opened up and that rock formations have been discovered and uncovered. There would be benches that would encompass high walls  and most limestone mines are going to have drilling and blasting operations. This is very different than moving dirt from one pile to another in the form in which it was extracted. Any one of these five items would be sufficient to resolve the borrow pit question? Absolutely. Can you address the sizing argument that Judge McKeague raised? Certainly. We know that Jones Brothers had to size the rock because TDOT itself distinguished between graded solid rock and solid rock. Solid rock was just blasted and moved. Graded solid rock had to be sized by definition. We know that Jones Brothers sized this rock to cash in on the nearly million dollar contract. It sized the rock in three different ways at least. It sized the rock by pattern blasting and that is supported by blaster Ben Coleman's testimony that he blasted in a pattern to produce rocks within certain size parameters. It's also supported by Kevin Hinson's testimony that Jones Brothers sized the rock when it set off the shot. We know that Jones Brothers also sized the rock by using the hoe ram. There, this court cannot disturb the credibility and determination of Judge Reyes that Inspector Williams saw the excavator picking up rocks that looked like they had been crushed with a hoe ram and loading those rocks onto a Mack truck. It's not an abuse of discretion for an ALJ to credit the opinion of an experienced Federal Mine Inspector who reached a common sense conclusion. Counsel, by way of background and just for my own edification, can you tell me if you know why Jones Brothers is so anxious to have this excavation site designated as a borrow pit instead of a mine and suggested they want to be under the jurisdiction of OSHA instead of this MSHA? Is that the reason or what's this all about? Precisely. By all accounts, MSHA's enforcement scheme is much more stringent than OSHA's. There are mandatory unannounced inspections, there's more training requirements, there's more requirements to report accidents. Jones Brothers is trying to evade this jurisdiction that Congress had entrusted to MSHA over mines. The Mine Act is much more tailored towards these types of dangerous activities that Jones Brothers is operating, and MSHA authority and jurisdiction is entirely appropriate in this case as it is a quarry. Has there been a change in philosophy by the agency as Jones Brothers argues that they're now tightening down on borrow pits to column mines? I'm not sure what evidence Jones Brothers is pointing to for that proposition because MSHA has always asserted jurisdiction over quarries and the Commission has affirmed jurisdiction over operations which are using materials for the purpose of road construction. This is not a first-time instance, this is not selective enforcement. Jones Brothers knew this was a quarry, they knew it was a mine, and they were trying to evade Mine Act jurisdiction. You were doing fine up until there, but I got to ask you, where is there evidence that they knew it was a mine and they were trying to evade jurisdiction? Where does that come from? Jones Brothers has an operator ID. Jones Brothers is not ignorant to the existence of MSHA. They have an operator ID with MSHA. They've worked at quarries removing overburden, but they know about MSHA, they know what a quarry is, and they knew that they were extracting minerals in non-liquid form. They were absolutely subject to the Mine Act. And it's strange credulity that Jones Brothers was looking to the 1979 interagency agreement to determine that it was a borrow pit when it is plainly subject to the Mine Act. But all you have to prove is one of those. Absolutely. To show that it's not a borrow pit so we don't need to worry about intention Certainly. The real issue is whether it was intermittent, whether it was sized, all of the five categories. Is there another one of those categories that you think is significant and you need to address before your time's up? Yes, I would like to address the intrinsic value. This was something that was heavily regulated by TDOT. They had an on-site inspector every day making sure that what Jones Brothers was going to use for the road repair was graded solid rock. And it's obvious as to why Jones Brothers was heavily regulating this. The road had washed into the river before. They wanted to make sure that this was graded solid rock, something that geologists had determined was the most suitable material to serve as the foundation due to the higher interlocking angle or angle of internal friction, also known as phi angle. Finally, if this site had only been sand or clay or the rock had not met the soundness quality or testing that TDOT subjected it to, Jones Brothers would have had to keep looking for a new site or buy the rock from another quarry. This quarry was a mine. This court should affirm the ALJ's decision. Thank you. And we'll have rebuttal. In many respects, the OSHA regulations for safety are more stringent than the MSHA regulations. On mine training? Not on mine training. Your Honor, that assumes that it is a mine. Let's take it one step at a time. Like high wall, that's a particular issue. The OSHA regulations are stronger than MSHA on high wall. So by staying with OSHA, in some respects, we are better for our workers than MSHA. But this stuff that's come out now, that's not a part of the record. That's not a part of the brief. I mean, if the court wants additional briefing on what that is, I guess we could do that. Just out of curiosity, if you're not trying to get under OSHA jurisdiction as what's driving this litigation, would you mind saying why you want this site designated as a bower pit and not as a mine? Why do you want that? The pit's right here, and the road repair's right here. That means when these trucks go back and forth and back and forth, that means we go from OSHA to MSHA to OSHA to MSHA, over and over and over. The same people, the same equipment goes back and forth from one to the other. And the other thing is it's pointed out, well, we had this certificate. I'm not following that exactly. Are you saying that the location for the road work is under one agency jurisdiction and the excavation site is under the different agency jurisdiction? Is that what you're saying? I'm not quite following that point you were just making. That's the position they're taking. Our position is it's all under OSHA because it's a bower pit. But there's no question that when we go down to the road repair, that's not a bower pit. That's got nothing to do with the pit. And if you got your rock from a quarry, you would be under the mining rules, right? Well, we would not be under the mining rules. The quarry would be. The quarry would be, yes. And I do want to point out that there were seven layers to this road and all of the top six layers all came from a quarry. But what the state of Tennessee says with graded solid rock, and it's their standard, it's, quote, primarily for fill. And so that goes to the concept of their suggestion, well, it's because it's next to the river. They use that for everything when they want fill. And so there's nothing special about it. And so when you get to that point about, well, it's the intrinsic value, everything has intrinsic value and everything has bulk. But the state of Tennessee has made it very clear that the primary, the more important thing is the bulk or the fill. Now, so what is our standard of review in deciding this appeal and our review of the administrative law judge? What standard of review are we supposed to be using here? Well, you review the facts under substantial evidence, but the facts have got to be established because it's jurisdiction. The facts have got to be established by the secretary. And that goes to this time thing. And I fully appreciate that there's difficulty. I can't say how short, and the other side can't say how long this is supposed to be. But in this particular case, I want to emphasize that, number one, this business about 68 tons, that's not valid. That's not in the record. That's not what was removed. I'm still not sure what you're saying. I'm saying our legal standard of review is for looking at the decision of the administrative law judge. Well, then beyond the substantial evidence, I'm not sure what the court is asking you. All right. Okay. May as well continue. Well, I just wanted to finish up. Before you leave this business about intrinsic value, it just seems to me that even though, well, let me start over. It just seems to me that when there's certain specifications for this lowest level of what is eventually going to be a roadbed on the top, there's no dispute that the different specifications from the bottom level to the higher levels were to facilitate drainage in that bottom level. Right? I'm not sure I'm understanding the question. There's no dispute that. You couldn't put sand in the bottom level because it wouldn't drain. Yeah. You put fill. For the state of Tennessee, what fill is is graded solid rock, and it's primarily, that's the quote, primarily for fill, which means it's more for its bulk. Why are there specifications as to size and shape for that bottom layer if it's just fill? Well, once again, that's got nothing to do with the water. They use that all over the state. Well, that's what you say. The other side says that it's so that the water can drain through it so it won't wash out. Well, no, that's what the record says, Your Honor. The record makes it very clear that that's used even when it's not near water. That's fill. That's just, I mean, it has. So why is there a certain specification for fill at the bottom level that, if I'm right, is different than the fill in the higher levels? Just explain to me why does the state care if it's not for drainage? Because it is a better fill material. I mean it. And why is it a better fill material? Well, I'm sure for the record you'd have to have expert evidence that was not introduced, but the concept is... I'm trying to figure out if it's a better fill because of its intrinsic value. It's a better fill because, as you say, you don't want sand. You want some category of material that's going to be good fill. I mean, if you're building a driveway, you put the gravel down first and then you put the concrete on top of it. There's some fill. At least part of the reason why you have those specifications, or the state does, is because of the intrinsic value of the material you're using for the fill. Part of the reason, but not the primary reason. If it were considered to be the primary reason or more reason for the intrinsic value, that would convert every road contract into a mine that has to... I mean, when you drive down the highway and you see they've cut into the side of the road, that would convert every one of those into a mine. And that would be contrary to, as we pointed out, I mean, with more than 40 years' experience at Jones Brothers, Mr. Wright with his company, this is just completely something different that's been changed. And even MSHA, we gave one example of where this very same specter, they've changed the standard just over the past few years. But I see that my time has expired. I'd be very happy to answer any other questions, or at least try to. Yes, thank you very much. I just thank both sides for their arguments, and the case is submitted. There being no further cases, the argument court may be adjourned.